**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 29, 2025**

# In the Court of Appeals of Georgia

A25A1443. SHE FARMS, LLC et al. v. INVENERGY SOLAR
    DEVELOPMENT NORTH AMERICA, LLC et al.

FULLER, Senior Judge.

SHE Farms, LLC, Dena Butler Stowers, Patricia Butler Hale, Jenny Butler Evers, and JB Butler Farms, LLC (collectively, "the Plaintiffs") filed suit against Invenergy Solar Development North America LLC and Camilla Solar Energy, LLC (collectively, "the Defendants"), alleging claims for breach of contract, fraud, fraudulent inducement, and anticipatory breach.[1] Following cross-motions for summary judgment, the trial court granted summary judgment in favor of the

---

[1] The Defendants filed a counterclaim for breach of contract. The trial court denied summary judgment with respect to the counterclaim, which remains pending below.

Defendants on all of the Plaintiffs' claims. The Plaintiffs appeal. For reasons that follow, we affirm in part and reverse in part.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56(c). On appeal, we review a trial court's summary judgment ruling de novo, construing the evidence in the light most favorable to the non-moving party. See *Patel v. Diplomat 1419VA Hotels*, LLC, 358 Ga. App. 732, 733 (856 SE2d 340) (2021).

Viewed in this manner, the record shows that the Butler family owned two tracts of land totaling approximately 900 acres in Mitchell County.[2] Invenergy operated a solar energy facility in Mitchell County. In as early as 2014, April Montgomery contacted Stowers about using the Butler property to generate solar power. Although not an employee of Invenergy, Montgomery — who was the

---

[2] The property was owned by the parents of Stowers, Hale, and Evers. Their father died in 2014. At that point, it appears the property was placed in trust for their mother's benefit. After the mother passed away, the trust was dissolved and the property was transferred to JB Butler Farms, a limited liability company formed by the siblings.

president of her own company — handled all pre-contractual communications with Stowers.

On April 19, 2017, a "Solar Lease and Easement Agreement" was entered into by Stowers and Michael Kaplan on behalf of Invenergy.[3] In general terms, the contract gave Invenergy the exclusive right to develop 295 acres of the property for the production of solar energy. In December 2018, Invenergy assigned the contract to Camilla Solar Energy, LLC. Stowers also assigned the contract to SHE Farms, LLC, a company set up by Stowers and her sisters to act as the operational entity for the family farm.

In October 2020, SHE Farms filed suit against Invenergy, and the complaint was subsequently amended to include Camilla Solar Energy, LLC as a defendant.[4] The complaint alleged claims for: (1) breach of contract based upon Camilla Solar's failure to pay the "fixed fee" required by the contract; (2) fraudulent inducement based upon Invenergy's "false and misleading representations" as to the annual payments to be

---

[3] Stowers signed in her capacity as Trustee for her mother's trust, and her mother — who was still alive at the time — also signed the agreement.

[4] The amended complaint listed the additional plaintiffs, including Stowers' sisters and JB Butler Farms, LLC.

made under the contract; (3) fraud based on a recording in the county deed book of a document purporting to encumber the entire farm rather than just 295 acres; and (4) anticipatory breach. The Defendants answered and asserted a counterclaim.[5]

The parties filed cross-motions for summary judgment. Following a hearing, the trial court found the Defendants were entitled to judgment as a matter of law on all of the Plaintiffs' claims. This appeal followed.

1. *Breach of Contract.* According to the Plaintiffs, the trial court erred in finding, as a matter of law, that the Defendants were not obligated to pay $150,000 per year in fixed fees as required by the contract. At a minimum, the Plaintiffs contend that the contract is ambiguous and thus a jury issue exists. We agree.

The contract at issue, with attached exhibits, is over 40 pages. Thus, we focus on the provisions relevant to this dispute, which include the terms (as in defined date ranges) of the agreement and the required payments, which were triggered — at least in part — by those terms. The lease provided as follows:

3.

---

[5] The counterclaim, which is not at issue in this appeal, alleged that Plaintiffs conveyed an interest in the property to a third party in breach of the lease.

Term. The term of this agreement shall commence on the Effective Date [of April 19, 2017] and continue for the following described periods (collectively, the "Term"):

3.1

Development Term. This Agreement shall be for an initial term (the "**Development Term**") commencing on the Effective Date and continuing until the earlier to occur of: (a) the date on which Grantee [Invenergy] begins selling commercial quantities . . . of electrical energy generated by the Solar Generating Equipment to be included in the Project to a third-party power purchaser, not to include electrical energy sold, produced or generated by the Solar Generating Equipment in furtherance of backfeed tests[,] . . . or (b) the third (3rd) anniversary of the Effective Date.

3.2 *Operations Term*. Upon the expiration of the Development Term, the term of this Agreement shall automatically extend for an additional twenty-five (25) year term (the "**Operations Term**"), automatically commencing upon the expiration of the Development Term[.]

3.3 Extended Term. Provided that Grantee has not fully surrendered or terminated this Agreement, and that the Owner has not terminated

this agreement . . . Grantee may, at its option, extend the term of this Agreement for an additional twenty-five (25) year period (the "**Extended Term**"). Grantee may exercise its option to extend this Agreement for the Extended Term by giving Owner written notice thereof on or before one hundred and eighty (180) days prior to the expiration of the Operations Term.

4.      Payments to Owner. In consideration of the rights granted hereunder, Grantee will pay Owner the amounts set forth in Exhibit B attached hereto. Exhibit B shall not be recorded without the specific prior written consent of Grantee.

Exhibit B provided as follows:

In consideration for the rights provided to Grantee under the Agreement, Grantee agrees to make payments to Owner as follows:

1. *Development Term Fees*. Beginning on the Effective Date and ending on the Operations Date, Grantee shall pay Owner an annual fee of SEVEN THOUSAND FIVE HUNDRED DOLLARS ($7,500) in Year 1 TEN THOUSAND DOLLARS ($10,000) in Year 2 and FIFTEEN THOUSAND DOLLARS ($15,000) in Year 3 (the "**Development Term Fee**"). Payment of the Development Term Fee shall be made annually in advance with the first payment due on or before sixty (60) days following the Effective Date and each subsequent payment shall be due on or before each anniversary of the Effective Date, as applicable.

2. *Operating Fees*. Beginning on the Operations Date and ending on the date on which Grantee ceases to operate the Solar Generating Equipment on the Property, Grantee shall pay to Owner:

(a) the following sums (referred to herein as the "**Fixed Fee**"):

(i) One Hundred Fifty Thousand Dollars ($150,000.00); and

(ii) the product of FIVE HUNDRED DOLLARS ($500.00) and the number of Net Acres of the Developed Property then subject to this Lease in excess of three hundred (300) acres (the "**Per Acre Payment Amount**"). Prior to completion of construction, the "Developed Property" acreage shall be that portion of the Property upon which Grantee anticipates installing Solar Generating Equipment based on Grantee's site plan as of the Operations Date, and post-construction it shall be that portion of the Property upon which Grantee has actually installed Solar Generating Equipment.

Notwithstanding the above, Owner acknowledges that Grantee may build the Project in phases and all of the Property may not be included in the initial phase or subsequent phase(s). Commencing on the first full calendar year after the Operations Date, such Fixed Fee shall be increased on a compounded basis by two percent (2.0%) per calendar year. Notwithstanding the above, Owner acknowledges that Grantee may build the Project in phases.

(b) *Transmission Facilities Payment*. A one-time payment of One Hundred Thousand Dollars ($100,000) for transmission lines installed on the Property. Ten percent (10%) of the Transmission Facilities Payment will be paid on or before forty-five (45) days following the Effective Date. The balance will be paid within forty-five days (45) of the commencement of construction of the Transmission Facilities. The terms "commencing construction" and "commencement of construction" as used in this Agreement shall mean the date on which Grantee begins excavation of foundations on the Property.

(c) *Access Easement Fees*. Grantee will pay Owner Seventy-Five Thousand Dollars ($75,000) per year during the Operations Term for access to the substation located on parcel 00790-017-000. Commencing on the first full calendar year after the Operations Date, such Access Easement Fees shall be increased on a compounded basis by two percent (2.0%) per calendar year.

The crux of the Plaintiffs' breach of contract claim is that under the agreement, Camilla Solar — as the assignee of Invenergy — is obligated to pay the $150,000 per year fixed fee. But the Defendants argued[6] — and the trial court agreed — that the Defendants were not obligated to pay the $150,000 fixed fee unless they actually

---

[6] Although the breach of contract claim was raised solely against assignee Camilla Solar, the Defendants filed a joint motion for summary judgment, and the trial court referred collectively to the Defendants in its order. We also refer to the Defendants collectively for ease of reading.

installed solar panels on the property. Because no solar generating equipment had been installed, the trial court found that the Defendants were entitled to judgment as a matter of law on the Plaintiffs' breach of contract claim.[7]

In construing a contract, the cardinal rule is to ascertain the intent of the parties from the language of the contract. *Mueller Systems, LLC v. SIPCO, LLC*, 375 Ga. App. 106, 111 (3) (913 SE2d 802) (2025).

> Contract interpretation is guided by three steps: First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

Id. (citation modified).

> A contract is ambiguous if the words used therein leave the intent of the parties in question — i.e., that intent is uncertain, unclear, or is open to various interpretations. On the other hand, no ambiguity exists where, examining the contract as a whole and affording the words used therein

---

[7] Although a substation was built on the property and transmission lines installed, it is undisputed that no solar panels have been installed on the property.

their plain and ordinary meaning, the contract is capable of only one reasonable interpretation.

*Anderson v. David*, 367 Ga. App. 883, 888 (889 SE2d 114) (2023) (citation modified).

The contract at issue is ambiguous because the language governing the "Operating Fees" is subject to two reasonable, yet contradictory, interpretations based on the agreement's structure. On the one hand, the contract clearly defines the "Operations Term" as the 25-year period that automatically commences upon the expiration of the "Development Term." And the payment schedule links the "Operating Fees" — which include the $150,000 "Fixed Fee" — to this period.[8] Thus, the contract could reasonably be construed as requiring the "fixed fee" to be paid during the "Operations Term."[9] But as noted by the trial court, the purpose of the contract as a whole was to generate solar power. And the language specifying when

---

[8] Indeed, it appears that the Defendants have begun paying the transmission fee and access easement fee, which were required under the "Operating Fees" payment schedule.

[9] Although no solar panels have been installed, Michael Kaplan, a senior vice president for Invenergy, agreed that the contractual "operations date" has already occurred. And under the plain language of the contract, the "Development Term" expired at the latest on the third anniversary of the effective date or no later than April 19, 2020.

the "Operating Fees" obligation ends — "on the date Grantee ceases to operate the Solar Generating Equipment on the Property" — ties the fee obligation directly to the physical operation of the equipment. Because these two constructions cannot be harmonized without nullifying one of the provisions, the contract remains ambiguous.[10]

"Where an ambiguity exists, the court may look outside the written terms of the contract and consider all the surrounding circumstances to determine the parties' intent." *Liggins v. Parkwood Living, LLC*, 373 Ga. App. 140, 146 (2) (b) (907 SE2d 731) (2024) (citation and punctuation omitted). Here, however, parol evidence does not resolve the ambiguity. See id. (parol evidence may be considered only when the contract contains an ambiguity). It is apparent from the record that, from the outset, the Plaintiffs and the Defendants had entirely different understandings of the payment terms. As stated previously, the cardinal rule of construction is to ascertain the intent

---

[10] One rule of contract construction — the rule that the contract should be construed against the drafter — has no application here. See *Reichman v. S. Ear, Nose & Throat Surgeons, P.C.*, 266 Ga. App. 696, 699–700 (1) (598 SE2d 12) (2004) ("[W]here the construction of a contract is doubtful, the construction that goes most strongly against the drafter of the agreement is to be preferred."). The contract expressly provided that this particular rule would not be applied, and neither party argues otherwise.

of the parties from the language of the contract. See *Mueller Systems*, 375 Ga. App. at 111 (3). Where, as here, it is not possible to ascertain the parties' intent, a jury must determine the meaning of the agreement. See *AMAC Two, LLC v. Web, Ltd.*, 370 Ga. App. 119, 127 (1) (894 SE2d 414) (2023). The trial court thus erred in granting summary judgment to the Defendants on the Plaintiffs' breach of contract claim.

2. *Fraud in the Inducement.* The Plaintiffs allege that the trial court erred in granting summary judgment on their claim for fraud in the inducement. This claim was predicated on the Plaintiffs' allegation that "Invenergy repeatedly represented that Plaintiffs would [receive] a 'guaranteed annual of payment of $225,000 in year one, escalating annually.'" In support of this claim, the Plaintiffs provided an email they received from Montgomery that included an updated version of the contract and stated "Invenergy has agreed to $75,000 annual access payments contingent on the deletion of the equal payment clause in exhibit c. This brings your guaranteed annual payment of $225,000 in year one, escalating annually."[11] Because the terms in Montgomery's email differed from the terms of the contract, the trial court found that

---

[11] Because it is unnecessary to the resolution of this claim, we do not address whether Montgomery was an agent of the Defendants such that her alleged misrepresentation to the Plaintiffs could serve as the basis of a fraud claim against the Defendants.

the Plaintiffs' fraud in the inducement claim did not survive summary judgment. We agree with the trial court.

> A plaintiff alleging fraudulent inducement may either affirm the contract and sue for damages, or . . . promptly rescind the contract and sue in tort for fraud. When the plaintiff enters into a written agreement, the fraud required to support a claim of fraudulent inducement must be of a nature that the plaintiff was deprived of an opportunity to read the agreement.

*Vah v. Platinum Marietta, Inc.*, 376 Ga. App. 5, 8 (1) (a) (918 SE2d 100) (2025) (citation modified).

The Plaintiffs' fraudulent inducement claim fails because the underlying contract contained a merger or "Entire Agreement" clause specifying that the written contract represented the entire agreement between the parties. In order to pursue their fraudulent inducement claim, the Plaintiffs were required to rescind the contract and sue in tort. *Liberty v. Storage Trust Props.*, 267 Ga. App. 905, 910 (2) (600 SE2d 841) (2004). Because the Plaintiffs have not purported to rescind the contract — indeed, they seek to recover under the contract — they may not recover for fraudulent inducement. See id. at 910-11 (2). Furthermore, "when one has entered a contract with a binding and comprehensive merger clause, any reliance upon precontractual

13

representations is, generally speaking, unreasonable as a matter of law." *Jimenez v. Houseboats on Lanier, Inc.*, 370 Ga. App. 788, 792 (1) (899 SE2d 334) (2024) (citation and punctuation omitted). Accordingly, the trial court properly granted summary judgment on the Plaintiffs' fraud in the inducement claim.

3. On appeal, the Plaintiffs also argue that the trial court erred in granting summary judgment on their fraud claim. In their complaint, the Plaintiffs alleged that the Defendants engaged in fraud by "intentionally fail[ing] to survey" the property to establish the 295 acres actually encumbered and by subsequently filing documents that purported to encumber the entire 900-plus acre farm.[12] The trial court granted summary judgment to the Defendants on this claim based on the Plaintiffs' failure to establish damages. The trial court ruled correctly.

A party alleging a fraud claim must establish five elements: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *Collins v. Regions Bank*, 282 Ga. App. 725, 727 (1) (639 SE2d 626) (2006)

---

[12] The two "filings" included a copy of the assignment of the lease from Invenergy to Camilla Solar and a memorandum of encroachment and reimbursement agreement between Camilla Solar and another company.

14

(citations omitted). On summary judgment, a claim of fraud can be defeated by showing an absence of evidence as to only one of the elements. Id.

The Plaintiffs' complaint alleged no damages as a result of the fraud. When pressed for information as to what harm had been caused by the Defendants' improper description of the encumbrance, Stowers responded "Well, if we wanted to sell or make some kind of change, we couldn't do it because they have encumbered all of our property." But she did not claim that the Plaintiffs had made any attempt to sell the property. Stowers' husband was also deposed, and he claimed that the improper encumbrance had prevented them from "[t]alking honestly" with other solar companies and had "potentially hampered" deals.

To sustain a claim for fraud, the Plaintiffs must show actual economic loss. *CSS Real Estate Dev. I, LLC v. State Bank & Trust Co.*, 324 Ga. App. 184, 186 (749 SE2d 773) (2013). Opinions, predictions, and conjecture about potential damages are insufficient to oppose a motion for summary judgment. Id. Accordingly, the Plaintiffs' failure to produce evidence of actual economic loss as a result of the alleged fraudulent conduct of the Defendants is fatal to their fraud claim. Id.

4. Finally, the Plaintiffs contend the trial court erred in granting summary judgment on their claim for anticipatory breach. Such a claim will lie when one party to a bilateral contract absolutely refuses to perform and repudiates the contract. *Chaudhuri v. Fannin Regional Hosp.*, 317 Ga. App. 184, 187 (1) (730 SE2d 425) (2012). In light of our holding in Division 1 that issues of fact remain as to the breach of contract claim, summary judgment on the claim for anticipatory breach must also be reversed. See *AMAC Two*, 370 Ga. App. at 127.

*Judgment affirmed in part; and reversed in part. Dillard, P. J., and Mercier, J., concur.*